IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| Child Evangelism Fellowship of South Carolina, ) | C.A. No. 8:04-1866-HMH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **MEMORANDUM OF DECISION** |
| ) | |
| Anderson School District 5, ) | |
| ) | |
| Defendant. ) | |

**I. PROCEDURAL HISTORY**

On June 14, 2004, Child Evangelism Fellowship of South Carolina ("CEF") filed a verified complaint and a motion for preliminary injunction. The case was assigned to the Honorable Henry F. Floyd, who recused himself on May 2, 2006. The case was reassigned to the undersigned on May 16, 2006.

In its complaint and motion for preliminary injunction, CEF alleges that Anderson School District 5 (the "District") violated CEF's rights under the First and Fourteenth Amendments to the United States Constitution by contravening the Establishment Clause and CEF's rights to free speech, free exercise of religion, and equal protection. (Compl. ¶ 1.) CEF seeks a declaratory judgment, preliminary and permanent injunctive relief, and damages. Because CEF alleges its constitutional claims pursuant to 28 U.S.C. § 1983, the court has federal question jurisdiction under 28 U.S.C. § 1331.

A hearing was held on May 24, 2006. Because the District had previously requested additional time for discovery, and Judge Floyd had set the discovery deadline for June 30, 2006, the court inquired about the additional discovery requested by the District. The District's sole

1

remaining discovery request was to depose Dawn Badger ("Badger"), the district director of CEF. Badger was present in the courtroom, and the court directed the parties to take her testimony at the hearing. After a direct examination and a brief cross-examination, both parties agreed that no additional discovery was necessary, that the issues in the case had been adequately briefed to the court in the parties' memoranda in support of and opposing preliminary injunctive relief and summary judgment, and that the case was ripe for a decision. Although both parties initially requested a jury trial, both later withdrew their requests and submitted the matter to the court for a decision. At the parties' request, the court allowed the parties to submit briefs on any remaining issues, which both parties submitted on May 31, 2006. Each party filed a reply brief on June 2, 2006.

After consideration of all of the relevant evidence of record and the arguments of the parties, the court now declares its findings of fact and conclusions of law. Should a finding of fact constitute a conclusion of law, or vice versa, the court adopts it as such and directs that it be treated accordingly.

## II. FINDINGS OF FACT

1.    CEF is a nonprofit religious organization incorporated in Missouri, with a chapter office in Taylors, South Carolina. The District is the governing body for public schools in District Five of Anderson County. The Good News Club ("Club") is a nondenominational club for children ages 5-12 which encourages learning, spiritual growth, and service to others through religious and moral education by teaching lessons from the Bible, singing hymns, reading stories, and memorization of Bible verses. CEF sponsors the Club. The Club does not collect fees or donations from attendees. It conducts meetings on elementary school campuses after school for convenience to the parents and for safety

reasons, and only meets when school is in session.

2.    On or about June 27, 2003, Badger wrote the Superintendent of the District, Betty Bagley ("Bagley"), requesting permission to use the District's facilities to host Club meetings. Bagley responded on July 8, 2003, informing CEF that if it wished to use the facilities, CEF had to follow the procedures set forth in District Policy KG-R ("policy KG"). Further, Bagley informed CEF that, based on a preliminary review, she thought that CEF's application to use the facilities would be approved.

3.    On July 29, 2003, Badger wrote the Assistant Superintendent for Finance and Operations for the District, David Brooks ("Brooks"), requesting that the fee for using the facilities be waived.

4.    At the time of the initial application, policy KG set forth the District's policy concerning fee waiver.  Policy KG expressly provided free access to the District's facilities to three groups.  First, the policy permitted free access to "district schools and school-related organizations," designating such use as "school use" and noting that "[p]arent-teacher organizations/associations, district organizations, band and athletic booster clubs, SADD, 4-H clubs, FFA and FHA organizations, and other similar organizations are considered school organizations and will not be charged for facility use."  (Pl.'s Mem. Supp. Summ. J. Ex. A (Policy KG at 1).)  Second, policy KG permitted free access for usage "as a result of joint business/education partnerships" with the District.  (Id. Ex. A (Policy KG at 2).) Third, and finally, the policy permitted governmental bodies or agencies to use the facilities, but only if the proposed use was when the "building is normally open and staffed," the school's "educational program is in no way disrupted[,] and . . . no special custodial service are [sic] required."  (Id.)

3

5.    In addition to the three groups allowed free use of the facilities, policy KG also specified

that

>   [t]he district reserves the right to decline any rental application and/or to
>   waive any or all charges as determined to be in the district's best interest.
>   In determining whether to waive a fee, consideration may be given to non-
>   profit organizations providing programs/activities for students which are
>   determined to be in the best interest of the district.

(Id. Ex. A (Policy KG at 1).)

6.    Brooks replied to CEF on August 6, 2003, denying CEF's request for a fee waiver due to

"the extent and frequency of [CEF's] planned use of [the District's] facilities." (Compl.

Ex. D (Letter from Brooks to Badger of 8/6/03, at 1).)

7.    The District approved CEF's application to use the facilities on October 1, 2003, subject to

the District's schedule of user fees. (Def.'s Mem. Supp. Summ. J. 2.) Brooks informed

CEF that it would be charged a minimum of $48.00 per week for usage of the facilities.

(Compl. Ex. F (Letter from Brooks to Badger of 10/1/03, at 1).)

8.    On November 13, 2003, Badger again wrote Brooks, requesting that he reconsider his

decision to charge CEF for using the facilities. Brooks responded on November 20, 2003,

citing policy KG, informing CEF that the only groups which have used the facilities

without paying the fee are the Boy and Girl Scouts (collectively "Scouts") and the YMCA

after-school program, an organization that operates in a partnership with the District to

provide "a day care or after school program." (Hr'g Tr. 29.) Brooks noted the District's

long-standing practice to waive fees for these three groups, that the District had done so

for many years, and that other groups which routinely use District facilities are charged a

usage fee for doing so. (Compl. Ex. H (Letter from Brooks to Badger of 11/20/03, at 1-

2).)

4

9.      After CEF filed its verified complaint and motion for preliminary injunction on June 14, 2004, the District revised policy KG, re-designating it as policy KF on August 17, 2004.

10.     Policy KF retained the same language as policy KG in granting free access for school use, and use by District partners and governmental bodies and agencies. (Pl.'s Mem. Supp. Summ. J. Ex. I (Policy KF at 1).) Policy KF also granted free use of the facilities to groups which began using the facilities "at a time when fees were not charged for such uses or to organizations or groups who have made use of the district's facilities for at least twenty years." (Id. Ex. I (Policy KF at 1-3).) However, policy KF does not contain the fee-waiver provision in policy KG allowing the District to waive the fee if the organization provides programs or activities for students which are determined to be in the District's "best interest."

11.     CEF did not qualify for a fee waiver under any of the provisions listed above and paid to use one school's facilities to host Club meetings for part of the 2003-2004 school year and part of the 2004-2005 year. In total, CEF paid $1,545.00 to use the facilities.

12.     CEF was unable to continue to use the school facilities or expand to use other school facilities because of financial hardship. The District's facility usage fee prevented or at least delayed CEF from attaining its goal to have the Club meet in all of the elementary schools in the District.

13.     The District's requiring CEF to pay a fee to use its facilities was due to CEF's not meeting the District's criteria for a fee waiver under the District's policies. There is no persuasive evidence that CEF's religious viewpoint, the religious content of CEF's message, or CEF's identity had any bearing on the District's decision to require CEF to pay fees for using its facilities.

5

### III. CONCLUSIONS OF LAW

CEF alleges that the District's practice and policy of charging CEF for use of school facilities, while allowing other similar groups to use school facilities for free, violates CEF's rights as protected by the United States Constitution.  CEF challenges the District's practices and policies KG and KF both on their face and as applied.  Ultimately, CEF raises five constitutional challenges to the District's practices and policies:  (1) the District violated CEF's equal protection rights guaranteed under the Fourteenth Amendment; (2) the District violated CEF's First Amendment rights as viewpoint-based, content-based, or speaker discrimination; (3) the District violated the Establishment Clause and Free Exercise Clause by discriminating against religious speech; (4) policies KF and KG are unconstitutionally vague; and (5) the policies constitute unconstitutional prior restraints on speech.

### Preliminary Issues

The District raises three arguments which would preclude this court from addressing the merits of any of CEF's claims.  First, the District argues that the Eleventh Amendment of the United States Constitution deprives the court of jurisdiction to consider CEF's claims.  Second, the District argues that CEF lacks standing.  Finally, the District argues that CEF's claims are moot.  As set forth below, the court may consider the merits of CEF's claims because the District's arguments concerning the Eleventh Amendment, standing, and mootness fail.

**1.    The Eleventh Amendment does not prevent CEF from bringing this suit.**

The Eleventh Amendment limits the jurisdiction of federal courts to hear cases against states and state officers acting in their official capacities.  Immunity under the Eleventh Amendment does not extend to political subdivisions of a state such as counties

6

or municipalities, but does confer immunity to an arm of the state.  <u>Mount Healthy City School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 280 (1977).  The question before the court is the same as the question before the court in <u>Mount Healthy</u>, whether a school district "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend."  <u>Id.</u>  There are conflicting opinions on this issue from the District of South Carolina.  In <u>Calef v. Budden</u>, 361 F. Supp. 2d 493, 497 (D.S.C. 2005), <u>Smith v. School District of Greenville County</u>, 324 F. Supp. 2d 786, 796 (D.S.C. 2004), and <u>Stewart v. Laurens County School District No. 55</u>, No. 6-92-1603-2, 1992 WL 12014673, at *7 (D.S.C. Oct. 2, 1992) (unpublished), the court found that the school districts were arms of South Carolina (the "State") and thus immune from suit.  However, in <u>Green v. Clarendon School District Three</u>, 923 F. Supp. 829, 850 (D.S.C. 1996), and in <u>Adams v. Richland School District One</u>, 412 F. Supp. 647, 651 (D.S.C. 1976), the court found that the school districts were <u>not</u> arms of the State for purposes of Eleventh Amendment immunity.  The diverse holdings even within the District of South Carolina underscore the conclusion that Eleventh Amendment immunity is a case-specific inquiry that is dependent on the individual laws at issue.  <u>See</u> <u>Ambus v. Granite Bd. of Educ.</u>, 995 F.2d 992, 994 (10th Cir. 1993).  After a careful review, the court concludes that the Eleventh Amendment does not bar this suit.

In determining whether or not the District is an arm of the State entitled to sovereign immunity, the court is required to consider the twin aims of the Eleventh Amendment: 1) to alleviate the states' fears that federal courts "would force them to pay

their Revolutionary War debts," and 2) to affirm the integrity retained by each state in the federal system. Cash v. Granville County Bd. of Educ., 242 F.3d 219, 223 (4th Cir. 2001) (quoting Hess v. Port Auth Trans-Hudson Corp., 513 U.S. 30, 39 (1994)). Accordingly, the first and most critical step is determining "whether a judgment against the government entity would have to be paid from the State's treasury." Cash, 242 F.3d at 223. If a judgment would be required to be paid from the State's treasury, the inquiry ends there, and the entity is immune from suit. Kitchen v. Upshaw, 286 F.3d 179, 184 (4th Cir. 2002). However, "[a] finding to the contrary weighs against immunity." Id. If the State's treasury will not be used to satisfy a judgment, the court must proceed to the second step–to determine if the relationship of the entity with the State is such that proceeding against the entity would "implicate the dignity of the State as a sovereign." Id.

### 1. Effect on the State's Treasury

With respect to the first step, although CEF seeks a refund of its payments to the District and nominal damages, neither party argues that the State's treasury would be affected by a judgment in favor of CEF. Therefore, the court finds that a judgment in CEF's favor would have no effect on the State's treasury. Having made this determination, the court must proceed to the second step, "keeping in mind that the most important factor–the [lack of] vulnerability of the State's purse–counsels against a finding of immunity." Cash, 242 F.3d at 225 (internal quotation marks omitted).

### 2. Impact on the State's Sovereign Dignity

The court's review of the second step confirms that the District is not entitled to immunity. The United States Court of Appeals for the Fourth Circuit's holdings in

8

<u>Cash</u>, determining that North Carolina school districts are not immune under the Eleventh Amendment, and <u>Maryland Stadium Authority v. Ellerbe Becket Inc.</u>, 407 F.3d 255 (4th Cir. 2005), applying <u>Cash</u>, guide the court's analysis.

In both <u>Cash</u> and <u>Ellerbe Becket</u>, the court applied three factors in determining whether allowing the suit to proceed against the entity would infringe the relevant state's sovereignty: (a) the extent of control that the state exerts over the District and degree of autonomy that the entity enjoys from the state, (b) whether the entity deals with local rather than statewide concerns, and (c) the manner in which state law treats the entity. <u>Cash</u>, 242 F.3d at 225-26; <u>Ellerbe Becket</u>, 407 F.3d at 261. Each of these factors will be addressed below.

a. Extent of the State's Control Over the District

With respect to the first factor, the Fourth Circuit in <u>Ellerbe Beckett</u> acknowledged a warning from the United States Supreme Court that "gauging actual control . . . can be a perilous inquiry, an uncertain and unreliable exercise." 407 F.3d at 261 n.10 (internal quotation marks omitted). As such, the court "encourage[d] district courts to analyze . . . three factors rather than engaging in a free-wheeling inquiry into the autonomy of the state entity in question": (1) "whether the state retains a veto over the entity's actions," (2) "the origins of the entity's funding," and (3) "who appoints the entity's directors." <u>Id.</u> at 261 n.10 & 261 (internal quotation marks omitted).

Concerning the first factor, the District advances little argument with respect to whether the State can veto the District's actions. Instead, the District relies on the analysis the court made in <u>Smith</u>, in which the court conducted a "review of South Carolina's

system of public education" to gauge the actual control exerted by the State over its school

districts.  Smith, 324 F. Supp. 793-94.  The District simply argues that the State's power to

veto "is satisfied by this Court's finding [in Smith] of a degree of pervasive state control

that would equate to a veto of school district decisions if district decisions were to come

into conflict with numerous supervening requirements of state law and regulations."

(Def.'s Reply Supp. Summ. J. 5.)  Despite this conclusory statement that the State retains

veto power over the District, the District did not identify a single specific provision to

support its argument.  The Smith court analyzed the relationship between the State and its

school districts for actual control and did not analyze the control factor under the sub-

factors set forth in Ellerbe Becket or explicitly discuss the State's power to veto decisions

of the District.  As such, the District's mere reference to Smith does not establish that the

State has the power to veto the District's decisions.

Upon review, the court finds that, while school districts in North Carolina

appear to have more local control than those in South Carolina, the Fourth Circuit's

analysis in Cash weighs in favor of finding that the District had sufficient control such that

a judgment against the District would not affront the dignity of the State.  Just as in Cash,

the District is an independent body which may sue and be sued, purchase liability

insurance, and retain private counsel, as it has in this case, without permission of the South

Carolina Attorney General.  Cash, 242 F.3d at 225; S.C. Code Ann. §§ 59-17-10 (1976)

(defining each district as a body corporate and stating that it may sue or be sued in its

name), 1-11-140 (1986) (purchasing liability insurance).  Similarly, the District board may

purchase and hold real and personal property, build and repair buildings, and declare

10

bankruptcy.  Cash, 242 F.3d at 225; S.C. Code Ann. §§ 59-17-10 (holding real and

personal property), 59-19-90(5) (1976) (managing property), 59-19-180 (1976)

(purchasing property), 59-19-250 (1976) (selling property); 6-1-10 (1976) (declaring

bankruptcy).

   In Cash, the court noted that statewide rules concerning teacher certification or

core curriculum or even the power of the state board to suspend the powers of the local

board "does not mean that, in the matters of administration and employee relations, the

local school boards are not autonomous." Id. at 226.  While the Smith court reviewed

numerous statutes and regulations governing various aspects of state education, this court

considers that many of those regulations are statewide standards akin to core curriculum or

certification requirements to ensure base levels of performance and education across the

State.  Accordingly, such standards do not ultimately undermine the conclusion that the

District actually administers the programs and maintains compliance with the standards.

See S.C. Code. Ann. § 59-19-90(5), (7) (1976) (giving the local board of trustees the

authority to "take care of, manage and control the school property of the district" and to

"[m]anage and control local educational interests of its district, with exclusive authority to

operate or not to operate any public school or schools").

   Further, though South Carolina appears to retain veto power over some school

district decisions, such as requiring prior approval before the districts may buy or sell real

property or begin construction, that ultimately does not undermine the conclusion that the

District retains autonomy.  Finally, neither party has argued how the State could have

vetoed the District's decisions and policies concerning the usage and fees required by the

District for groups such as CEF.  In sum, the court finds that, despite South Carolina's

veto power over some aspects of the District's affairs, the District has failed to show that

the State's veto power deprives it of the substantial autonomy it has in administering the

policies and standards of the State.

Regardless, even if the first factor, the extent of the State's control over the

District, weighed in favor of a finding of control by  the State, the other two factors under

Ellerbe Becket counterbalance it.  It is undisputed  that the District receives less than half

of its funding from the State, and that the State provides only 2% more funding to the

District than the District receives locally.  Finally, it is also undisputed that the District's

board of trustee members are appointed locally by the county board of education, not by

the State.  See S.C. Code Ann. § 59-19-30 (2004).  In conclusion, after reviewing the three

factors set forth in Ellerbe Becket, the court finds that the District retains sufficient

autonomy from the State such that a judgment against it would not affront the dignity of

the State.

b.  Whether the District Deals with Local or Statewide Concerns

The second factor also weighs in favor of a finding that the District is not

immune from suit.  The District does not dispute CEF's argument that the District deals

with local, not statewide concerns.

c.  The Manner in which State Law Treats the District

The third and final factor also weighs in favor of a finding that the District is not

immune from suit.  As explained in Ellerbe Becket, the question is whether the State treats

the District as its alter ego.  407 F.3d at 265.  As stated in Cash, this inquiry "overlaps with

12

[the court's] analysis of State control versus local autonomy." 242 F.3d at 226. Despite some noted differences, there are numerous factors listed above, such as the ability of the District to contract, to own property, and to carry liability insurance, which weigh in favor of finding that the District is treated more like a local entity than an arm of the State.

Further, in <u>Cash</u>, the court noted that in the North Carolina Statutes dealing with state departments, school districts are "expressly excluded" from the definition of a state agency. 242 F.3d at 226. While CEF has raised no argument with respect to the definition of a state agency under South Carolina law, CEF contends that the South Carolina Code addresses school districts in Title 6, which deals with local governments, and not in Title 30, which deals with departments of the State government. (Pl.'s Mem. Opp'n Summ. J. 10, 12.) The District did not refute this argument in its reply. (Def.'s Reply Supp. Summ. J. 6.) Finally, as noted above, not only may the District sue and be sued, but school districts have brought suit against the State. <u>See, e.g.</u>, <u>Richland County Sch. Dist. 5 v. South Carolina Dep't of Educ.</u>, 517 S.E.2d 444 (S.C. Ct. App. 1999); <u>Abbeville County Sch. Dist. v. State of South Carolina</u>, 515 S.E.2d 535 (S.C. 1999). That school districts have brought suit against the State weighs in favor of a finding that the State treats the District not as an arm of the state, but as an autonomous entity. Therefore, after careful consideration of the record and the relevant law, the court concludes that the Eleventh Amendment does not provide immunity to the District.

**2.    CEF has standing to bring its claims.**

The doctrine of standing follows from the constitutional limitation of federal court jurisdiction to actual cases or controversies. U.S. Const., art. III, § 2, cl. 1. "A

justiciable case or controversy requires a plaintiff who has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005) (internal quotation marks and alteration omitted). To have standing to bring suit, a plaintiff must offer evidence to support the conclusion that: (1) "the plaintiff . . . suffered an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there [is] a causal connection between the injury and the conduct complained of"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, (1992) (internal citations and quotation marks omitted).

        The District contends that CEF lacks standing because the decision to not waive the fee and the policies, which prevented the Club from using the facilities without paying the fee, has not injured CEF. Instead, the District argues that factors other than the fee have prevented CEF from using the facilities.

        The District's argument is without merit. While other factors may have contributed to CEF's stopping the Club meetings temporarily, at least one of the causes was the required fee. Badger, in her affidavit, affirmed that "CEF made the decision to discontinue the Good News Club at Midway Elementary due to personal reasons of the Good News Club teacher, but also because CEF could no longer afford to pay the fee for use of the school facilities." (Pl.'s Reply Mem Supp. Summ. J. Ex. 1 (Badger Aff. ¶ 4).) (emphasis added). Moreover, Badger explained CEF's intent to establish the Club

14

throughout the District and the effect the fees had on that goal: "CEF desires to begin a Good News Club at other schools in the Anderson School District Five and it is CEF's desire to one day have a Good News Club in every elementary school within the District," but "CEF cannot afford to pay the facilities usage fee for the Good News Club meetings. <u>CEF has had to forego its desire to have a Good News Club in every elementary school within the District because of inability to pay the usage fees.</u>" (<u>Id.</u> Ex. 1 (Badger Aff. ¶¶ 5-6)) (emphasis added). Badger's testimony at the hearing on May 24, 2006, further confirms that CEF has been injured by the policies and practices of the District and the causal connection between the injury and the District's policies and practices. Finally, because the injunctive, declaratory, and damages relief that CEF seeks would remedy its damages, the court finds that the District's argument that CEF lacks standing is without merit.

**3.     CEF's claims are not moot.**

The doctrine of mootness, like standing, follows from the constitutional limitation of federal court jurisdiction to actual cases or controversies. U.S. Const., art. III, § 2, cl. 1. "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 67, (1997) (internal quotation marks omitted). Thus, "a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969) (internal quotation marks omitted).

15

The District's mootness argument centers around its changing policy KG to KF after CEF initiated this suit and its position that CEF's damage claims are barred by the Eleventh Amendment. "The burden of demonstrating mootness is a heavy one" if a defendant voluntarily ceases the alleged wrongdoing and attempts to show that the alleged wrong will not recur, and interim relief or events have resolved the effects of the alleged wrong. Los Angeles County v. Davis, 440 U.S. 625, 631 (1979) (internal quotation marks omitted). Moreover, as noted above, the court has found that the Eleventh Amendment offers the District no immunity. Additionally, CEF is attacking both policies, and not only seeks the return of fees paid while policy KG was operative, but argues that policy KF, while worded differently, maintains the same discriminatory effect initiated under policy KG. There is no dispute that CEF seeks the funds it paid the District under policy KG and that the District has not refunded them, so the effect of the District applying policy KG to CEF's fee waiver application remains. Cf. id. Upon review, the court finds that the District's argument that CEF's claims are moot is without merit.

### Merits of the Constitutional Claims

As an initial matter, an explanation of the court's factual finding (number 13) concerning the District's basis for charging CEF fees for using the District's facilities is warranted. Throughout its pleadings, CEF argues that the District discriminated against CEF on the basis of its religious viewpoint and the content of CEF's message. Accordingly, CEF has relied upon cases including Good News Club v. Milford, 533 U.S. 98 (2001), Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819 (1995), and Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384 (1993), in arguing that the District impermissibly

16

discriminated against CEF.  Ultimately, the District has not disputed that discriminating against CEF on the basis of viewpoint or content is prohibited, but has argued that it never discriminated against CEF on either of those bases.

Upon reviewing the evidence, the court concludes that the District has not discriminated against CEF on account of CEF's religious viewpoint or the religious content of CEF's speech, but treated CEF differently from other organizations for other reasons which were legitimate. This finding distinguishes the instant case from Good News Club, Rosenberger, and Lamb's Chapel, in which the defendants treated the plaintiffs differently because of or based on the religious content of their speech or their religious viewpoints.  See Rosenberger, 515 U.S. at 827; Lamb's Chapel, 508 U.S. at 389; Good News Club, 533 U.S. at 103.

CEF also contends that the District impermissibly conducted "speaker discrimination," arguing that the District is prohibited from "dictating the subjects about which persons may speak and the speakers who may address a public issue."  First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 785 (1978).  In essence, CEF's argument is that not only is the District prohibited from discriminating on the basis of viewpoint or content, but it also may not choose who gets to speak at the District's facilities.  The court has carefully considered this argument and the authorities cited by CEF and agrees with CEF that many of these cases turn on the defendants' discriminating on the basis of content.  (Pl.'s Mem. Opp'n Summ. J. 24); see, e.g., Police Dep't of City of Chicago v. Mosley, 408 U.S. 92, 94 (1992) (invalidating an ordinance which permitted picketing with respect to a labor dispute but barred all other types); Chicago Acorn v. Metro. Pier and Exposition Auth., 150 F.3d 695, 704, 700 (7th Cir 1998) (striking down the Pier Authority's decision to rent the pier for $1 to the Democratic Party but refusal to do the same for the plaintiff

and finding that the Pier Authority may not "employ political criteria to decide who may use its facilities and on what terms").  In any event, as explained below, the court finds that the District's treatment of CEF had nothing to do with CEF's identity, the content of CEF's message, or CEF's religious viewpoint, but turned exclusively on CEF's status relative to the other groups permitted to use the facilities for free.  Those groups are either school-sponsored, District partners, governmental bodies or organizations, or long-term users of the District's facilities.  CEF is not.

The reasons given for treating CEF differently than other groups are constitutional. Moreover, although policies KF and KG facially could allow invidious discrimination, there is no indication that the District has ever interpreted and applied those policies in a way that contravenes either CEF's or any other group's constitutional rights.  These findings necessarily color the court's analysis of whether the District violated CEF's rights by charging CEF a fee for using its facilities.

1.    **The District's policies do not violate CEF's Fourteenth Amendment rights guaranteed under the Equal  Protection Clause.**

CEF alleges that the District violated the Equal Protection Clause of the Fourteenth Amendment by treating it differently than other organizations.  CEF contends that the District applied policy KG initially to discriminate against CEF by requiring CEF to pay a fee (after determining that waiving the fee was not in the District's best interests), and then crystalized the effects of that discrimination through the enactment of policy KF.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws,

18

which is essentially a direction that all persons similarly situated should be treated alike."

City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (internal

quotation marks omitted).

> Section 5 of the Amendment empowers Congress to enforce this mandate,
> but absent controlling congressional direction, the courts have themselves
> devised standards for determining the validity of state legislation or other
> official action that is challenged as denying equal protection.  The general
> rule is that [the official action] is presumed to be valid and will be sustained
> if the classification drawn by the statute is rationally related to a legitimate
> state interest.

Id. at 439-40.  "Unless a classification trammels fundamental personal rights or is drawn

upon inherent suspect distinctions such as race, religion, or alienage, [the court]

presume[s] the constitutionality of the statutory discrimination and require[s] only that the

classification challenged be rationally related to a legitimate state interest."  City of New

Orleans v. Dukes, 427 U.S. 297, 303 (1976).

    As noted above, when CEF requested that the District waive the fee for it to

use the facilities, policy KG was in place, which permitted free facility usage to schools

and school organizations, government bodies and agencies,  business/education partners of

the District, and those organizations for which the District determined a fee waiver to be in

the District's best interest.  (Pl.'s Mem. Supp. Summ. J. Ex. A (Policy KG at 2).)  The

current policy, KF, lacks the provision that would permit the District to waive the fee for

using the facilities if the District determined that such a waiver was in its best interest, but

expressly still allows free access to the three groups listed in KG and to groups which have

been using the facilities for twenty or more years or organizations which began using the

facilities "at a time when fees were not charged for such uses."  (Pl.'s Mem. Supp. Summ.

J. Ex. I (Policy KF at 3).)

CEF raises two arguments with respect to its Equal Protection claim.  First,

it argues that the District distinguished between CEF and other groups which received free

use of the facilities on the basis of religion.  If religion were the basis of the District's

different treatment of CEF, the District's treatment of CEF would be subject to strict

scrutiny and would be sustained only if it was narrowly tailored to serve a compelling state

interest.  Cleburne, 473 U.S. at 440.  However, the court has analyzed the evidence

presented and found that the basis of the differential treatment between CEF and the other

groups was not the suspect classification of religion.  Accordingly, CEF's argument that

the District distinguished on the basis of religion, and that its actions are subject to strict

scrutiny, fails.  As such, the court applies rational basis scrutiny to CEF's claims.  See

Locke v. Davey, 540 U.S. 712, 721 n.3 (2004).[1]

Second, CEF argues that the District violated the Equal Protection Clause

and fails rational basis scrutiny because the District lacked any rational basis for

distinguishing between (1) school organizations and CEF and (2) the Scouts or YMCA

and CEF.  A classification passes the rational basis test if it is "rationally related to a

legitimate state interest."  Walker v. True, 399 F.3d 315, 325 (4th Cir. 2005).

---

[1]CEF has not argued that the District's actions "trammel[] fundamental personal rights"
as an alternative basis for heightened scrutiny under the Equal Protection Clause.  Dukes, 427
U.S. at 303.  Moreover, given the court's determination that the District has not violated
CEF's First Amendment rights as set forth below, any such argument would be without merit.
See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 54 (1983)(finding that
rational basis test applies when no violation to a plaintiff's fundamental rights has been
shown).

20

The District's different treatment of CEF from school organizations easily passes review under the rational basis test. The District differentiated between school organizations and CEF on the basis that schools had sponsored those organizations listed as "school organizations." When Brooks and Bagley were deposed, both testified that principals determined whether or not an organization was a school organization. (Pl.'s Add'l Attachments Supp. Pl.'s Mot. Summ. J. Ex. 2 (Brooks Dep. at 84); Ex. 3 (Bagley Dep. at 78).) A school organization is one that is sponsored by the school's principal. (Id. Ex. 2 (Brooks Dep. at 82); Ex. 3 (Bagley Dep. at 79).) Bagley suggested that school principals sponsor "activities that directly relate to the curriculum of the individual grades and to the mission of their schools." (Id. Ex. 3 (Bagley Dep. 79-80).) Brooks and Bagley's testimony is consistent with the minutes of the school board meeting held on December 14, 1982, during which the board adopted the facility fee schedule but waived fees for school-sponsored activities. (Def's Mem. Opp'n Summ. J. Ex. 3 (Board Minutes 1).)

It is entirely reasonable that the District would waive the facility fees for organizations offering programs and activities which the principals have determined are related to the curricula and missions of their schools. Significantly, there is no indication that CEF is school-sponsored or that it ever sought school sponsorship from any principal in the District. Though the record is ambiguous on this point, the District may not have informed CEF that it could become a school organization through applying to a principal. (Id. Ex. 3 (Bagley Dep. 86).) Given the similarities between CEF and other school organizations such as Students Against Destructive Decisions ("SADD") and Fellowship

21

of Christian Athletes ("FCA") and the evidence in the record concerning the content of CEF's programs, if CEF were to apply to a principal to become a school organization, the court cannot see how the principal could deny such an application without infringing CEF's equal protection rights. Nonetheless, CEF never applied to a principal for that status, and the District merely differentiated between CEF and other organizations considered school organizations because of their status as such. The court finds that school sponsorship is a rational basis for the District to distinguish between school organizations and CEF, and because CEF never sought (or was denied) that status, CEF has not shown that its equal protection rights were violated.

The court also finds that the District had a rational basis for distinguishing among the YMCA, the Scouts, and CEF. First, the YMCA is a District partner, providing after-school programs with the District. Although the District initially listed the YMCA as receiving free use on the basis of long-term use of the facilities, the District expressly provided in policies KG and KF for the YMCA to have free use of the facilities by virtue of its status as a District partner. CEF made no argument with respect to the partnership basis failing under the rational basis test, and the court finds that, for the same reasons that the District may grant free access to those organizations it sponsors, it is reasonable for it to grant free access to its designated partners which assist in providing programs to the students. Moreover, there is no indication that CEF attempted to become a District partner such that it could be entitled to free access to the facilities for that reason. (Def.'s Resp. Opp'n Summ. J. 7.)

22

Second, the District had a reasonable basis for treating the Scouts differently than CEF. Of course, like CEF, the Scouts provide after-school programs for children. However, the Scouts have provided these programs to children on the District's facilities, without charge, for over twenty years. A provision which protects the reliance interests of the Scouts to continue offering their programs is a sufficient rational basis to justify the different treatment between the Scouts and CEF. See Nordlinger v. Hahn, 505 U.S. 1, 13 (1992) ("The protection of reasonable reliance interests is not only a legitimate government objective: it provides an exceedingly persuasive justification." (Internal quotation marks omitted)); Heckler v. Matthews, 465 U.S. 728, 746 (1984) (acknowledging that "the legitimacy of protecting reasonable reliance on prior law" is such that it even justifies "allowing an unconstitutional statute to remain in effect for a limited period of time" to protect those interests); see also Good News/Good Sports Club v. School Dist. of the City of Ladue, 859 F. Supp. 1239, 1244 (E.D. Mo. 1993), rev'd on other grounds, 28 F.3d 1501 (8th Cir. 1994) (finding that the longstanding relationship between the Scouts and the school was a "valid and reasonable" basis to limit access to school facilities and justified treating the Scouts differently than the Good News/Good Sports Club); see generally Helton v. Hunt, 330 F.3d 242, 245-47 (4th Cir. 2003) (upholding, in the face of an Equal Protection Clause challenge, a North Carolina statute that used a grandfather clause to treat owners of video poker machines who brought their machines into North Carolina before a certain date differently than those who brought their machines after the date). Accordingly, the court finds that the District had a legitimate interest in protecting the Scouts' reasonable reliance on free access to the facilities, and the

exception granting such access to those organizations which have used the facilities for

twenty years or more is rationally related to that interest.  Accordingly, the District did not

violate the Equal Protection Clause in distinguishing between CEF and the school

organizations, the YMCA, and the Scouts.

**2.    The District's policies do not violate CEF's First Amendment Rights on the grounds of viewpoint, content, or speaker-based discrimination.**

        CEF also argues that the District's policies violate CEF's First Amendment

rights to free speech.  The First Amendment states that "Congress . . . shall make no law

. . . abridging the freedom of speech," and was made applicable to the states via the

Fourteenth Amendment.  U.S. Const. Amend. 1; Goulart v. Meadows, 345 F.3d 239, 246

& n. 6 (4th Cir. 2003).  In considering a First Amendment claim, the court's first inquiry is

whether the right CEF asserts is considered "protected speech."  Goulart, 345 F.3d at 246.

Without question, CEF's asserted right is protected speech, and the District has not argued

to the contrary.

        Given that CEF's speech is protected under the First Amendment, the court

must identify the "nature of the forum, because the extent to which the Government may

limit access [to the forum] depends on whether the forum is public or nonpublic.  After

identifying the type of forum, the court must assess whether the justifications for exclusion

from the relevant forum satisfy the requisite standard."  Id.  (internal quotation marks

omitted).  "The type of forum that exists here, however, is relevant only if the . . .

restriction is viewpoint-neutral."  Sons of Confederate Veterans, Inc. v. Comm'r of

Virginia Dep't of Motor Vehicles, 288 F.3d 610, 623 (4th Cir. 2002).  If the restriction is

not viewpoint neutral, it is presumptively unconstitutional whether the forum is public or

nonpublic.  Id.

As noted above, the court has found that the District did not discriminate on the basis of viewpoint.  Further, the policies are viewpoint neutral.

When CEF requested that the District waive the fee for it to use the facilities, policy KG applied.  The current policy, KF, essentially maintains the status quo by permitting those who had free access to continue enjoying free access to the facilities, while removing the discretion to allow the District to waive fees for those entities for which the District determined a fee waiver was in the District's best interest.

The language of policy KG left a conspicuous door open for the District's administrators to discriminate on impermissible grounds.  An administrator could discriminate on the basis of viewpoint but use the policy to claim that a fee waiver was not in the District's best interest.  Further, the District's passage of policy KF, which allows those who had free access to continue having it because their use was free "at a time when fees were charged for such uses," could allow the administrator's decisions to be perpetuated.  (Pl.'s Mem. Supp. Summ. J. Ex. I (Policy KF at 3).)

Nonetheless, the court concludes that the District did not discriminate on an impermissible basis either in denying CEF's fee waiver request under policy KG or in adopting policy KF.  In arriving at this conclusion, the court has not ignored the effect of policies KG and KF.  See Schneider v. New Jersey (Town of Irvington), 308 U.S. 147, 160-61 (1939) (finding that freedom of speech is a fundamental right, stressing the importance of limiting restrictions on it, and noting, "In every case, therefore, where legislative abridgment of the rights is asserted, the courts should be astute to examine the

effect of the challenged legislation." Emphasis added.)

The District identified no group other than CEF that has to pay the fee for using the facilities for after-school educational programs for students.[2] (Hr'g Tr. at 47.) Accordingly, the District's application of policies KG and KF presently burdens only one facility user–CEF. Cf. Confederate Veterans, 288 F.3d at 625. Nonetheless, policy KG no longer applies, and policy KF's broad general application to all prospective groups that do not fall within limited exceptions distinguishes policy KF from cases in which facially-neutral classifications are impermissible due to their limited applicability. See Grossbaum v. Indianapolis-Marion County Bldg. Auth., 100 F.3d 1287, 1298 n.10 (7th Cir. 1996) (discussing the requirement of general applicability to a facially-neutral restriction of speech).

Neither policy KG nor policy KF facially discriminates against CEF on the basis of viewpoint. Further, in applying policies KG and KF, the evidence that CEF's viewpoint was the basis of CEF being denied free access to the facilities is minimal. Rather, the evidence is abundant that the Scouts' long-term use of the facilities served as the District's basis for allowing them to use the facilities for free. Moreover, CEF's argument that the District discriminated against CEF in favor of school organizations such as Students Against Destructive Decisions ("SADD") or Future Homemakers of America

---

[2]The record reveals that there are many groups, secular and religious in nature, that receive free access to the facilities because they either use the facilities infrequently or use only outdoor facilities. Similarly, there are groups, both secular and religious in nature, which regularly use the indoor facilities and pay for that use. However, CEF differs from those paying groups in that it seeks to provide educational programs for the children on a regular basis, using indoor facilities.

("FHA") (now known as Family, Career and Community Leaders of America ("FCCLA"))

on the basis of viewpoint fails.  Rather, both Bagley and Brooks explained that a school

organization is one which is school-sponsored, a determination made by the school

principals.  CEF is not school-sponsored, and there is no indication that CEF sought

school sponsorship either by applying for or requesting sponsorship from any principal in

the District.  In sum, the court concludes that the District's basis for determining whether

or not CEF was a school organization turned solely on CEF's status of not being school-

sponsored, a viewpoint-neutral, status-based classification.  See Goulart, 345 F.3d at 253

("The Supreme Court has repeatedly held that distinctions based on the *status* of the

speaker can be a permissible way to limit the scope of the forum.")

Nature of the Forum

Because policies KG and KF are viewpoint neutral, the court must consider

the type of forum.  The standards the court applies to determine whether the District has

unconstitutionally restricted CEF's access to the its facilities depend on whether the forum

is public or nonpublic.  Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473

U.S. 788, 797 (1985).  There are three types of fora:  traditional public fora, public fora

created by government designation or limited public fora, and nonpublic fora.  Id. at 802.

Traditional public fora are those, such as sidewalks and public streets, which "by long

tradition or by government fiat have been devoted to assembly and debate."  Id.  A public

forum created by government designation or limited public forum is one in which the

government permits speech "by the public at large for assembly and speech, for use by

certain speakers, or for the discussion of certain subjects."  Id.  A nonpublic forum is

27

government property which is not a traditional public forum, has not been designated by the government as a limited public forum, and is incompatible with general expressive activity, such as a military reservation or jailhouse grounds. Id. at 804. Based on the foregoing, the District's facilities during after-school hours are a limited public forum. See Goulart, 345 F.3d at 250 ("[T]wo types of government property . . . clearly are limited fora; public school facilities during after school hours and a student activities fund of a public university.")

Given that the District created a limited public forum, the District may limit access to the forum for certain groups or for the discussion of certain topics. Good News Club v. Milford Central School, 533 U.S. 98, 106 (2001). "The State's power to restrict speech, however, is not without limits." Id. "In addition to time, place, and manner restrictions, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983). Given that CEF had access to the forum, the key inquiry is whether the District could permissibly burden some groups, including CEF, with having to pay activity fees to use the forum while exempting others from those fees.

"Two levels of First Amendment analysis are applicable to limited public fora." Warren v. Fairfax County, 196 F.3d 186, 193 (4th Cir. 1999) (en banc). The first level, the internal standard, applies to the State's ability to distinguish between members of a group to which the limited public forum is made generally available. Id. The second level, the

28

external standard, concerns the State's power to limit the limited public forum to certain groups, to distinguish between groups instead of individuals within a group. Id. The court must first determine whether the internal or external standard applies, and then whether the District's actions comply with the requisite standard. Goulart 345 F.3d at 251.

The applicability of either standard turns on whether CEF is of a "similar character" to those allowed free access to the forum. Id. at 251. The District may not burden CEF with paying fees if its use is of "similar character" to those organizations that do not have to pay. Cf. id.

"[T]he purpose of the limited forum in question should serve as a touchstone for determining the relevant indicia of similarity between two proposed uses." Id. at 252. "If the difference between two proposed uses is unrelated to the purpose of the forum, then that difference should not serve as a basis for distinguishing between two otherwise-similar entities." Id. "But if the difference between two proposed uses bears some relationship to the purpose of the facility, then it would make sense for the government to use that difference as a basis for drawing boundaries." Id.

The introductory paragraphs of policies KG and KF, which contain the quoted quoted language below, provide a basis for the court to determine the purpose of the forum:

> The board recognizes the capital investment of the community in school property and desires that buildings and other facilities be used to promote the general welfare of the community. However, community use of school property must not interfere in any way with the educational program of the regular school day or afternoon and evening programs of pupils.

> Community use of school facilities cannot be subsidized with district funds. Therefore, the board reserves the right to restrict the use of school facilities to groups or organizations who will assume all responsibility for the use of these facilities by all persons who may attend the function for which the building is being used. This responsibility extends to the prompt payment of all charges due the school district for the use of the facilities and any damages which may accrue from use. . . . Facilities will only be made available to formally constituted, nonprofit community organizations or associations. . . .
>
> . . . .
>
> Use of school facilities by district schools and school-related organizations takes precedence over all other uses.

(Compl. Ex. B (Policy KG at 1).); Def.'s Mem. Supp. Summ. J. Ex. 4 (Policy KF at 1).) The purpose of the forum is to "promote the general welfare of the community" by providing facilities for district schools and those organizations assisting the schools with educating the pupils and, to the extent the facilities are not needed by the schools, allow use by government bodies and agencies and nonprofit community organizations. (Id.)

CEF has argued that it is similar to school organizations, the YMCA, and the Scouts. Despite some similarities between those groups and CEF, the District's differentiating between CEF and the groups allowed free access to the forum is permissible, as there are relevant distinctions between those permitted free access and CEF which are related to the purpose of the forum. As previously discussed, the District's basis for distinguishing between the school organizations and CEF is those organizations' school sponsorship, and the District's basis for distinguishing between CEF and the YMCA is the YMCA's partnership with the District. The District's policy of giving free access to the forum to school organizations, which schools sponsor because they are related to the school's curriculum and/or mission, is certainly related to the forum's

30

primary purpose of educating students.  Similarly, the YMCA's access to the forum due to

its status as a District partner is related to the purpose of the forum in the critical aspect

that the YMCA provides after-school care for the students.  (Hr'g Tr. 29; Def.'s Resp.

Opp'n Summ. J. 7.)  Both sponsorship by the schools and partnership with the District are

status-based, neutral criteria which are related to the purpose of the forum and thus may

serve as a basis for differentiating those groups from CEF.

Similarly, the District's differentiating between CEF and the Scouts due to the

Scouts' long use is related to the purpose of the forum.  The Scouts have used the facilities

for over twenty years.  As noted above, the Scouts' reasonable reliance on free access to

the forum is a legitimate interest.  See Nordlinger, 505 U.S. at 13.  Given the forum's

secondary purpose of serving nonprofit community groups to the extent that their use does

not interfere with the schools' use of the facilities, the District's allowing the Scouts,

which are nonprofit community groups that have substantially relied on free access to the

facilities, to continue using the facilities for free is consistent with the purpose of the

forum.  There is no indication that the Scouts have unduly burdened the District through

their use of the facilities or interfered with other groups' use of the forum in any way.

Allowing the Scouts to continue accessing the facilities as they have for decades without a

new burden of paying fees furthers the purpose of allowing community nonprofit groups to

access the facilities to the extent possible.  As such, there are distinctions between those

organizations which have free access to the forum and CEF that are related to the forum's

purpose, and CEF is not of "similar character" to those permitted free use.  Accordingly,

the District's charging CEF fees for its use of the facilities is not subject to the internal

31

standard and the strict scrutiny review it requires.  Goulart, 345 F.3d at 255.  Instead, the court must inquire whether the District's actions meet the external standard–whether the District's requiring CEF to pay a fee was "reasonable in light of the purpose of the forum and whether it is viewpoint-neutral."  Id.

The court's analysis above, both in evaluating CEF's claim under the Equal Protection Clause and in determining that a basis relevant to the purpose of the forum justifies differential treatment of CEF and those groups which have free access to the forum, conclusively shows that the District's actions comply with the external standard. The court has previously concluded that requiring CEF to pay a fee to use the facilities was viewpoint neutral.  Further, the court has concluded that the District's treatment of the organizations which receive free access to the forum is related to the purpose of the forum, and that the District had a rational basis to distinguish between CEF and the groups which have free access to the forum.

Given the purpose of the forum to provide facilities for schools primarily and allow open access to community nonprofit groups to the extent possible, the District's giving free access to school organizations, District partners, and the Scouts is reasonable.  See Goulart, 345 F.3d at 255  ("the government's decision to restrict access to a limited public forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation."  (Internal quotation marks omitted)).  It is perfectly reasonable that the District would permit those organizations which are school-sponsored due to their relation to the school's mission or curriculum to have free access to the school.  Moreover, it is reasonable that the District would give free access to its partner organization which

32

provides after-school day care for its students.  Finally, given its stated goal to provide

access to the extent possible to nonprofit community groups and the Scouts' extensive

reliance on free access to and minimal burden on the facilities, it is reasonable to protect

the Scouts' interests by permitting them to use the facilities.  In sum, the District did not

violate CEF's First Amendment rights by requiring it to pay a fee to use the facilities while

not requiring certain other organizations to do so.

**3.**     **The District did not violate CEF's First Amendment Rights protected by the Establishment and Free Exercise Clauses.**

"The Religion Clauses of the First Amendment provide:  Congress shall make

no law respecting an establishment of religion, or prohibiting the free exercise thereof."

Cutter v. Wilkinson, 544 U.S. 709, 719 (2005) (internal quotation marks omitted).  "The

first of the two Clauses, commonly called the Establishment Clause, commands a

separation of church and state.  The second, the Free Exercise Clause, requires government

respect for, and noninterference with, the religious beliefs and practices of our Nation's

people."  Id.  "While the two Clauses express complementary values, they often exert

conflicting pressures."  Id.  "Yet . . . there is room for play in the joints between them.  In

other words, there are some state actions permitted by the Establishment Clause but not

required by the Free Exercise Clause."  Locke, 540 U.S. at 718-19 (internal citation and

quotation marks omitted).

1.  Establishment Clause

The Establishment Clause of the First Amendment, applied to the States

through the Fourteenth Amendment, prevents a State from enacting laws that have the

purpose or effect of advancing or inhibiting religion.  Zelman v. Simmons-Harris, 536

U.S. 639, 648-49 (2002).  To determine whether a school had a legitimate Establishment

Clause concern in deciding whether to permit the Club to use its facilities, the Supreme

Court relied upon its Establishment Clause jurisprudence concerning federal aid programs.

See Good News Club, 533 U.S. at 114, 115-20 (finding that the school would not violate

the Establishment Clause by permitting the Club to use its facilities, and noting that the

Establishment Clause prevents the school from treating it differently on the basis of the

religious nature of its speech); Rosenberger, 515 U.S. at 845-46 (holding that the

Establishment Clause requires that the university treat religious groups neutrally).  The

Court's key consideration in Rosenberger and Good News Club was the government's

neutral treatment toward religion, and the court finds that the District did not violate the

Establishment Clause in this case because it treated CEF neutrally.  See Good News Club,

533 U.S. at 114 (citing Rosenberger).

        Unlike Good News Club and Rosenberger, the District's purpose of allowing

organizations, the District's partners, school organizations, and long-term (free) users of

the facilities to use the facilities for free was to serve legitimate government interests, and

the District acted neutrally towards religion in applying policies KG and KF.  Specifically,

the District's purpose in applying policy KG and in adopting and applying policy KF was

not to advance or inhibit religion.  See Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971)

(stating a three-part test for determining if a statute violates the Establishment Clause:

"First, the statute must have a secular legislative purpose; second, its principal or primary

effect must be one that neither advances nor inhibits religion; finally, the statute must not

foster an excessive government entanglement with religion" (internal citations and

34

quotations marks omitted)).[3]  Moreover, the principal effect is neither to advance nor inhibit religion, given the broad applicability of the policies to any groups wishing to regularly use the indoor facilities that do not meet one of the exceptions above.  Finally, the regulation does not foster an excessive government entanglement with religion.  Rather, policy KF requires all new, frequent users of the indoor facilities which do not meet the specific exceptions to pay for such use, whether they are religious or secular in nature.  As such, the court finds that the District has not violated the Establishment Clause.

### 2.  Free Exercise Clause

Nor has the District violated the Free Exercise Clause.  "The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, provides that Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) (internal citation and quotation marks omitted).  "In addressing the constitutional protection for free exercise of religion, . . . a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  Id.

As discussed previously, the District's policies are neutral and have general applicability.  The court finds that the purpose or object of the regulations was not "the

_____

[3]The court notes that the applicability of the Lemon test is uncertain, as it was not applied in Zelman or Good News Club.  See Van Orden v. Perry, 125 S.Ct. 2854, 2861 (U.S. 2005). Nonetheless, the court finds that the District has not violated the Establishment Clause under either the Lemon test or under Zelman and Good News Club.

suppression of religion or religious conduct," but rather to ensure that school and government organizations, those organizations which have a long-term reliance interest in using the facilities, and District partners have access to the facilities without being burdened by the fees other users have to pay. Id. at 533. These exceptions to the fee requirement serve legitimate government interests.

Moreover, the court has considered the effect of the policies to prevent CEF free access to the facilities. See id. at 535 ("[T]he effect of a law in its real operation is strong evidence of its object.") However, "adverse impact will not always lead to a finding of impermissible targeting." Id. This is one such case. The court finds that the purpose of the policies was not to suppress CEF's religious speech and that the policies are generally applicable, despite the incidental effect the policies have had on CEF. As such, the court finds that the policies do not violate the Free Exercise Clause.

**4.    The District's policies are not unconstitutionally vague.**

CEF raises two facial challenges to policies KG and KF. CEF confronts "a heavy burden" in advancing its claims, especially in light of the court's finding that the District has not discriminated against CEF on the basis of its religious viewpoint or content. See Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998) (internal quotation marks omitted). "Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort." Id. (internal quotation marks omitted) (emphasis added); see also FW/PBS, Inc. v. Dallas, 493 U.S. 215, 223 (1990) (noting that "facial challenges to legislation are generally disfavored"). To prevail, CEF must demonstrate a substantial risk that application of the provision will lead to the

36

suppression of speech.  See Finley, 524 U.S. at 580; see generally United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.")

CEF argues that the District's use of "best interest of the district" in policy KG and "other similar organization" in policy KF renders both policies unconstitutionally vague because "they 'either forbid[] or require[] the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application.'"  (Pl.'s Mem Supp. Summ. J. 25 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).  CEF further argues, "The prohibition against overly vague regulations protects citizens from having to voluntarily curtail their First Amendment activities because of fear that those activities could be characterized as illegal."  (Pl.'s Mem. Supp. Summ. J. 25.)

The cases CEF cites, including Connally, Lanzetta v. State of New Jersey, 306 U.S. 451 (1939), Grayned v. City of Rockford, 408 U.S. 104, 109 (1972), Hynes v. Motor & Council of Borough of Oradell, 425 U.S. 610 (1976), Smith v. Goguen, 415 U.S. 566, 571 (1974), Gooding v. Wilson, 405 U.S. 518 (1972), Coates v. City of Cincinatti, 402 U.S. 611 (1971), and Thornhill v. Alabama, 310 U.S. 88 (1940), support the proposition that the First Amendment protects people from vague penal statutes.  The statutes considered in each of these cases were unconstitutional because vague terms encompassed not only the impermissible conduct but also constitutionally-protected conduct, such as free speech and free association, chilling the exercise of those freedoms

and lending themselves "to harsh and discriminatory enforcement by local prosecuting officials." Thornhill, 310 U.S. at 97-98; see also Coates, 402 U.S. at 615 (concerning free assembly); Gooding 405 U.S. at 519-20 (involving criminal liability for using abusive language); Smith, 415 U.S. at 571-72 (penalizing flag misuse); Hynes, 425 U.S. at 611, 620 (preventing door-to-door solicitation); Grayned, 408 U.S. at 108 (holding that anti-noise ordinance was not overly vague); Lanzetta, 306 U.S. at 458 (criminalizing being a "gangster"); Connally, 269 U.S. at 393 (penalizing for not paying certain wage rates).

   In the instant case, there is no allegation that CEF has refrained from any speech out of concern for prosecution of a vague statute, and no showing that CEF is subject to any such penalty under the policies. See Finley, 524 U.S. at 588 (considering "undeniably opaque" standards for awarding grants and distinguishing them from those in penal or quasi-penal statutes: "if the[] [vague standards] appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns.") Moreover, the court has concluded that the District has not treated CEF differently on the basis of the religious nature of CEF's speech, either in considering CEF's application for a fee waiver under policy KG or in adopting policy KF.

   Furthermore, policy KG no longer applies, and policy KF is not vague. Although terms such as "school-related," "school organizations," and "similar organizations" appear vague, in application they are not. "School-related" organizations are merely organizations that are either operated directly by the school, such as the school band, or organizations sponsored by school principals. As previously discussed, "school organizations" refer to those organizations which are school-sponsored. The school

organizations which are listed in the policies, including SADD, 4-H, and others, constitute

a non-exhaustive list of some but not all of the school organizations. Hence, "similar

organizations" are merely those school organizations that are not listed in the policy. In

sum, the terms in policy KF concerning school-related organizations are clear in

application. Accordingly, CEF's argument that the District's policies are

unconstitutionally vague is without merit.

**5.    The District's policies do not constitute prior restraints on speech.**

CEF's second facial challenge to policies KG and KF is that they constitute prior

restraints on speech. "Prior restraint upon speech suppresses the precise freedom which

the First Amendment sought to protect against abridgement." <u>Carroll v. Presidents and

Comm'rs of Princess Anne</u>, 393 U.S. 175, 181 (1968). "[A] law subjecting the exercise of

First Amendment freedoms to the prior restraint of a license must contain narrow,

objective, and definite standards to guide the licensing authority." <u>Forsyth County,

Georgia v. Nationalist Movement</u>, 505 U.S. 123, 131 (1992) (internal quotation marks

omitted). However, in determining whether a prior restraint is unconstitutional, the court

must look beyond the mere text of the regulation: "In evaluating [the Plaintiff's] facial

challenge, [the court] must consider the [District's] authoritative constructions of the

[regulation], including its own implementation and interpretation of it." <u>Id.</u> However,

CEF must show a substantial risk that application of the provision will lead to the

suppression of speech. <u>Finley</u>, 524 U.S. at 580. CEF has not shown such a substantial

risk.

First, CEF argues that the District had unfettered discretion to restrain speech under policy KG by denying a fee waiver request merely on the grounds that such a waiver was not in the District's best interests. On its face, policy KG appears to be a prior restraint. However, the evidence reveals that the District interpreted and applied the policy to require all regular users of indoor school facilities to pay the fee, excepting only those organizations which were expressly given free access under the provisions of policy KG or those organizations that had free access to the facilities for decades. As such, the District did not use the discretion that policy KG allowed to discriminate in an impermissible way. Moreover, there is no dispute that the current policy, KF, removed the provision giving the District discretion to waive the fees if such a waiver was in the District's best interests. Accordingly, there is no risk that the District will abuse that discretion in the future.

Second, CEF argues that the provisions of policies KG and KF which allow for school-related organizations to have free access are invalid prior restraints because the policies do not define "school-related," "school organizations," or "similar" organizations. (Pl.'s Mem. Supp. Summ. J. Ex. A (Policy KG at 1) & Ex. I (Policy KF at 1).) As discussed in considering CEF's argument that these terms are vague, the District's application of the policies shows that these terms are not prior restraints on speech. The evidence shows that school-related organizations are designated as such on the basis of school sponsorship or because the school operates the organization directly, and "similar" organizations are those school-sponsored organizations which are not listed in the policy.

40

One concern that the court recognizes with respect to CEF's prior restraint argument is the potential for a school principal to discriminate on the basis of content or viewpoint in determining whether to sponsor an organization. Both Bagley and Brooks noted that the decision of whether a school sponsors an organization is determined by school principals, and the determination of whether or not to sponsor an organization rests on whether there is some relationship between the school's mission and/or curriculum and that of the organization. (Pl.'s Add'l Attachments Supp. Pl.'s Mot. Summ. J. Ex. 2 (Brooks Dep. at 84); Ex. 3 (Bagley Dep. at 78-80).) Such discretion in the hands of school principals raises some concern, but the court notes that the record is exceedingly thin on what criteria principals use in determining whether to sponsor an organization. As previously discussed with respect to CEF's equal protection claim, given the similarity between CEF and other school organizations, a principal and the District would be hard pressed to deny the sponsorship of CEF for any valid reason. However, although the principals appear to have discretion over whether to sponsor an organization, the record is void of information concerning how principals have exercised that discretion, and whether they have ever employed that discretion in a way that could endanger an organization's free speech rights.

Given these considerations, the Supreme Court's analysis in <u>Finley</u> is instructive. Ultimately, CEF's argument that "the provision is facially unconstitutional may be reduced to the argument that the criteria in [applying policy KF] are sufficiently subjective that the [District] <u>could</u> utilize them to engage in viewpoint discrimination." <u>Finley</u>, 524 U.S. at 583 (emphasis added). A principal's decision could be guided by numerous criteria.

Alternatively, a principal's decision to sponsor an organization could be entirely ministerial, with every request granted. In the final analysis, the court is left to speculate because CEF never attempted to obtain sponsorship from a principal, and the record is bare concerning what principals consider in making a sponsorship decision. Accordingly, because CEF has not attempted to obtain school sponsorship from any District school principal, this court is "reluctant, in any event, to invalidate" the regulation "on the basis of its hypothetical application to situations not before the Court." Id. at 584 (internal quotation marks omitted).

Third, and finally, CEF argues that policies KG and KF constitute invalid prior restraints on the grounds that the District lacked any deadline for making a determination on whether an organization may receive a fee waiver. There is no indication that the District ever delayed in processing CEF's request for a fee waiver, so CEF may lack standing to raise this issue in the first place. However, standing rules are loosened to allow a plaintiff to raise a facial challenge to a regulation. See Forsyth County, 505 U.S. at 129; Walker v. City of Birmingham, 388 U.S. 307, 344-45 (1967) (Brennan, J. dissenting). However, even assuming that CEF has standing, it has not shown a substantial risk that the District may use the policies to delay in processing a fee waiver request such that First Amendment rights may be chilled.

The current policy, KF, merely requires the District to make a ministerial determination–whether an organization qualifies for a fee waiver, either because it is a school organization, a government body or agency, a District partner, or an organization that has been using the facilities for twenty years or more or began using the facilities

42

before the District charged for such use.  On the record before the court, such a determination by the District is non-discretionary; either an organization qualifies for a fee waiver under one of these bases or it does not.  The nature of this determination, coupled with the fact that CEF has made no showing that the District has ever delayed in processing a fee waiver request, is conclusive.  The lack of a deadline for the District's determination does not constitute a prior restraint on speech.

CEF correctly notes that the Supreme Court has held that "a prior restraint that fails to place limits on the time within which the decision maker must issue the license is impermissible."  FW/PBS, 493 U.S. at 226.  However, in FW/PBS,  the Supreme Court was concerned about a statutory scheme that created a risk of delay with respect to a licensing authority's decision to grant a license to allow an applicant to operate an adult entertainment enterprise.  Id. at 222.  In that case, there was a substantial risk that the licensing authority could delay in processing a license application, given the analysis it would have to make concerning the content of the applicant's proposal.  Id. at 227.  Any such delay chilled the rights of the applicant, as the applicant could not operate without a license.  See id. at 229-30.  However, those concerns are not at play here, or are to a much lesser degree.  In this case, the issue is not whether the District is permitting CEF access to the forum altogether, but whether CEF is required to pay a reasonable fee to operate and maintain the facilities it seeks to use.  There is no argument that the fee is disproportionate to the amount it costs the District to allow CEF to use the facilities.  More importantly, under the analysis above, the District's evaluation of whether a fee waiver is appropriate is

ministerial under the current policy.[4]  Although there was a potential risk of delay under policy KG given the discretion permitted under the policy, there is no evidence that the District ever delayed in deciding a fee waiver request and policy KG is no longer operative.  For all of these reasons, the court finds that CEF has not shown that there is a substantial risk that the District will use policy KF to suppress any group's right to free speech.

## IV. CONCLUSION

Although policy KG left an open door for District administrators to discriminate on the basis of viewpoint, content, or identity, and CEF argued that the District did so, the evidence does not support that conclusion.  Rather, the evidence supports the finding that the District treated CEF differently for valid, constitutional reasons, and that the policy currently in place, KF, is neither unconstitutionally vague nor a prior restraint on speech.  Accordingly, after a thorough review of the record and the law applicable to this case, the court finds in favor of the District.

-----

[4]To the extent that one could argue that a school principal's decision whether to grant an application for school sponsorship would not be ministerial and could thus invite delay, the court again notes that there is no indication in the record that a principal's determination of school sponsorship is not ministerial and routinely granted.  Given the Supreme Court's direction that facial invalidation should be done sparingly and only as a last resort, the court declines to speculate whether a school principal might delay in considering a request by CEF that CEF be considered a school organization.  See Finley, 524 U.S. at 580.

It is therefore

**ORDERED** that CEF's request for preliminary injunctive relief is denied as moot.  It is further

**ORDERED** that CEF's request for permanent injunctive relief is denied.  It is further

**ORDERED** that CEF's request for a declaration that the District's policies are unconstitutional, on their face and as applied, is denied.  It is further

**ORDERED** that CEF's request for a declaration that the District unlawfully obstructed CEF from exercising its constitutionally-protected rights is denied.  It is further

**ORDERED** that CEF's request for damages, attorney's fees, and reasonable costs and expenses of this action is denied.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
July 7, 2006